**GUTRIDE SAFIER LLP**
SETH A. SAFIER (State Bar No. 197427)
seth@gutridesafier.com
MARIE A. MCCRARY (State Bar No. 262670)
marie@gutridesafier.com
RAJIV V. THAIRANI (State Bar No. 344390)
rajiv@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 271-6469
Facsimile:  (415) 449-6469

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDERSON SILVA and GRACE JONES, as individuals, on behalf of themselves, the general public and those similarly situated,<br><br>   Plaintiffs,<br><br>     v.<br><br>HALEON US HOLDINGS LLC; and HALEON US INC.,<br><br>   Defendants. | CASE NO.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATION OF THE CALIFORNIA CONSUMERS LEGAL REMEDIES ACT; FALSE ADVERTISING; FRAUD, DECEIT, AND/OR MISREPRESENTATION; UNFAIR BUSINESS PRACTICES; AND UNJUST ENRICHMENT**<br><br>JURY TRIAL DEMANDED |

1

**INTRODUCTION**

2      1.      Anderson Silva and Grace Jones ("Plaintiffs"), by and through their counsel, bring

3   this class action against Haleon US Holdings LLC and Haleon US Inc. (collectively, "Haleon" or

4   "Defendants"), to seek redress for Haleon's deceptive, unlawful, and unfair marketing and sale of

5   Sensodyne Pronamel line of toothpaste (the "Products").[1]

6      2.      Haleon prominently markets and advertises the Products with the claims

7   "Rebuilds," "Restores," and "Repairs" enamel. Reasonable consumers understand this to mean

8   that the Products are capable of rebuilding, restoring, and repairing lost tooth enamel. However,

9   this is false. The active ingredient in the Products is sodium fluoride, which is incapable of

10  bringing back—i.e., rebuilding, restoring or repairing—lost tooth enamel.[2] Once tooth enamel is

11  lost, it cannot be restored, repaired, or rebuilt with fluoride.

12     3.      Haleon's claims violate the FDCA's misbranding provision, which has been

13  adopted into California law, and states that a drug is misbranded if "its labeling is false or

14  misleading in any particular." Cal. Health & Safety Code § 110111; 21 U.S.C. § 352.

15     4.      Indeed, the FDCA has issued a monograph that specifies the kinds of claims that

16  can be made on fluoride toothpastes that are sold over-the-counter ("OTC"). Specifically, a

17  marketer of a fluoride toothpaste may only claim that the product "[a]ids in the ***prevention*** of

18  dental . . . 'cavities' [or] 'decay' . . . [or] '[o]ther truthful and nonmisleading statements" that the

19  product aids in the ***prevention*** of dental decay. Anticaries Drug Products for Over-the-Counter

20  Human Use, Final Monograph, 60 FR 52474-01, Subpart C - Labeling(c) (emphasis added).

21  Haleon's representations that the Products are capable of "Rebuild[ing]," "Restor[ing]," and

22  "Repair[ing]" enamel are prohibited because they are not claims regarding the Products ability to

23  ***prevent*** further cavities and decay. Rather, Haleon's representations falsely and unlawfully

24  _____

25  [1] Without limitation, Sensodyne Pronamel Multi-Action, Sensodyne Pronamel Daily Protection,
    Sensodyne Pronamel Gentle Whitening, Sensodyne Pronamel Fresh Breath, Sensodyne Pronamel

26  Intensive Enamel Repair toothpastes, and other Haleon OTC oral-health products containing fluo-
    ride and sold with a "Rebuild," "Restore," and/or "Repair" claim or similar variant (e.g., "Re-

27  builds," "Rebuilding").

28  [2] The Product also contains an additional active ingredient, potassium nitrate, but it is for tooth
    sensitivity and has no indication for repairing, restoring or rebuilding enamel.

convey to consumers that the Products can **reverse** or bring back lost enamel.

5.      Haleon knew that consumers would pay a much higher price for Products that are purportedly capable of bringing back lost enamel because enamel loss necessitates costly, often painful dental procedures, such as fillings, root canals, and crowns. However, the Pronamel line of Products is an advertising and marketing gimmick. Indeed, the Products have the same active ingredient, in the same concentration, as any other anticavity toothpaste. Despite that fact, Haleon advertises the Products as being specially formulated to "Rebuild[]" enamel, distinguishing the Product from other fluoride toothpastes that merely claim they prevent cavities and decay. In truth, the Products are no different than any other fluoride toothpaste as they concern enamel.

6.      Haleon's misrepresentations and mislabeling caused Plaintiffs and members of the proposed class to pay a price premium for the Products because they believed that they were purchasing a specialty product that would bring back, restore, or rebuild lost enamel. Had Plaintiffs known the truth about the Products, they would not have purchased them or, at a minimum, they would have paid less for them.

7.      In addition to damages, restitution, and statutory penalties, Plaintiffs seek, on behalf of themselves and the general public, an injunction precluding the sale of the Products within a reasonable time after entry of judgment, unless the Products' packaging and marketing are modified to remove any language suggesting that the Products bring back, restore, repair, or rebuild lost enamel.

## **PARTIES**

8.      Plaintiff Anderson Silva is, and at all times alleged in this Class Action Complaint was, a resident of San Francisco, California (San Francisco County). He makes his permanent home in California and intends to remain in California.

9.      Plaintiff Grace Jones is, and at all times alleged in this Class Action Complaint was, a resident of San Diego, California (San Diego County). She makes her permanent home in California and intends to remain in California.

10.      Defendant Haleon US Holdings LLC (f/k/a GlaxoSmithKline Consumer Healthcare Holdings (US) LLC) is a corporation existing under the laws of Delaware, having its

principal place of business in New Jersey, and registered to do business in California.

11.     Haleon US Inc. (f/k/a GSK Consumer Health, Inc.) is a corporation existing under the laws of Delaware, having its principal place of business in New Jersey, and registered to do business in California.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2). The aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and Plaintiffs and Haleon are citizens of different states.

13.     The injuries, damages and/or harm upon which this action is based, occurred or arose out of activities engaged in by Haleon within, affecting, and emanating from, the State of California. Haleon regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from products provided to persons in the State of California. Haleon has engaged, and continues to engage, in substantial and continuous business practices in the State of California.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the state of California, including within this District.

15.     In accordance with California Civil Code Section 1780(d), Plaintiffs concurrently file herewith a declaration establishing that, at various times throughout the class period, Plaintiff Silva purchased the Products from a CVS Pharmacy near his home in San Francisco, CA (Plaintiff Silva's declaration is attached hereto as Exhibit A.)

16.     Plaintiffs accordingly allege that jurisdiction and venue are proper in this Court.

## SUBSTANTIVE ALLEGATIONS

**A.  Haleon's Pronamel Fluoride Toothpaste Line of Products.**

17.     Haleon manufactures, distributes, markets, advertises, and sells various toothpastes and oral care products in the United States under the brand name "Sensodyne."

18.     Haleon describes itself as "one of the world's largest providers of specialist oral health. With a broad range of science based-products, such as Sensodyne, paradontax and Polident, [Haleon's] goal is to make the world's mouths healthier."[3]

19.     The Sensodyne line of Products contains a numbing agent that is designed for consumers with sensitive teeth.

20.     Many consumers with sensitive teeth also struggle with thinning or lost enamel because the two conditions are frequently connected. That is, thin enamel can cause sensitive teeth. Thus, Haleon markets a special line of Sensodyne toothpaste products under the brand name "Pronamel" that specifically caters to consumers who have sensitive teeth and thinning enamel.

21.     The word "Pronamel" is a portmanteau of the words "Pro" and "Enamel." This is specifically intended to communicate to consumers that the line of Products provides particular benefits to consumers who are seeking to rebuild or restore their enamel and/or who struggle with enamel loss.

22.     As part of the Pronamel line, Haleon markets, advertises and sells, for example Sensodyne Pronamel Gentle Whitening toothpaste, with the following label:



23.     Throughout the Class Period, Haleon uniformly represented to consumers that, in addition to providing "Cavity Prevention" and "Specialist Enamel Protection," the Products "Rebuild[]" and "Restore[]" enamel. Haleon also states that the Products provide "Gentle

---

[3] https://www.haleon.com/our-brands

Whitening."[4] These representations, along with the Pronamel brand name, cumulatively lead reasonable consumers to believe that the Product does not just prevent cavities, but reverses enamel loss by "Restor[ing]" and "Rebuild[ing]" enamel.

24.     The side panel of Sensodyne Pronamel Gentle Whitening, Haleon provides additional representations regarding the Product's ability to "Rebuild Enamel:"



25.     Consumers have no reason to doubt Haleon's unambiguous front-label claims and do not carefully study the side panel to fact-check them but, even if they did, the side panel reinforces the false claims on the front-panel of the Products.

26.     For example, the side panel includes four diagrams. The first diagram shows a healthy tooth with no erosion on it being exposed to acid. The next diagram shows a tooth with fissures and developing cavities. The next diagram shows a tooth being treated with the Product with the claim: "Pronamel Rebuilds & Restores Enamel." Finally, Haleon shows a perfectly healthy tooth with no erosion or fissures. This imagery is intended to convey and does convey that the Product actually rebuilds and restores lost tooth enamel.

27.     The fact that some of the statements on the Products suggest that they "Protect against cavities" and "prevent enamel loss" does not negate, qualify, or cure the statements that falsely convey to consumers that the Products can reverse enamel loss because reasonable consumers understand the "Rebuild[]" and "Restore[]" claims to be in addition to the protection claims—i.e., the Products protect teeth from cavities **and** also rebuild and restore lost enamel. This falsity is compounded by Haleon's claim that "Pronamel has a proven specialist technology that has been developed to maximize the effect of fluoride on enamel," which communicates to

---

[4] The Sensodyne Pronamel Multi-Action, Daily Protection, and Fresh Breath Products all include identical representations on the front display except they do not claim to provide "Gentle Whitening." *See* Exhibit B.

consumers that the Products are different and superior to other fluoride-based toothpaste that can only prevent cavities.

28.     Additionally, Haleon explains that enamel loss causes teeth yellowing. It makes claims regarding the ability of the Products to whiten teeth, which further reinforces in the mind of consumers the false belief that the Product also gently whitens teeth by rebuilding and restoring lost white enamel.

29.     Haleon also offers Sensodyne Pronamel Intensive Enamel Repair Whitening. Throughout the class period, Haleon uniformly represented to consumers that the Product provides "Intensive Enamel Repair":



30.     Contary to the other Products, there is an asterisk on the Sensodyne Pronamel Intensive Enamel Repair. The asterisk is inconspicuous and not proximate to the much larger "REPAIR" claim on the Product that consumers' eyes are drawn to. Further, the asterisk connects to fine print on the side panel of the Product, which consumers are unlikely to find because the asterisk on the side-panel is barely larger than a period. In any case, the side panel language reinforces the false "REPAIR" claim and does not clarify that the Products are not actually capable of repairing and restoring lost or damaged enamel:



31.     The side panel includes diagrams of an eroded tooth with developing cavities. The second diagram shows the cavities filled with minerals. The final picture shows a tooth with no erosion and no cavities to communicate that the Product actively repairs enamel loss. Consumers reasonably understand these images to mean that the Product can repair and reverse enamel erosion.

32.     Haleon further explains that "[a]cids in modern diets can weaken your enamel surface" and that "[o]ver time, this can lead to your enamel thinning." However, the Product "[a]ctively repair[s] acid-weakened enamel." Haleon describes the damage or weakening of teeth—i.e., thin enamel—and then includes repeated claims regarding the Products ability to actively repair teeth by restoring enamel. These statements are intended to convey that the Product can actually repair thin enamel.

33.     The "active repair" language is also intended to, and does, distinguish the Products from other fluoride toothpaste products that merely provide passive protection, and do not actively rebuild and restore enamel.

**B.  <u>Consumer Demand for Enamel Repairing Products.</u>**

34.     Good oral health care is extremely valuable to consumers because it is connected to longevity, affects mental health and self-esteem, and allows consumers to eat a diverse range of food (which is tied to overall health and wellness).

35.     Enamel is the protective outer layer of a tooth. It is exceptionally hard. However, over time, acids in foods and acids that are created as a byproduct of plaque bacteria, can slowly erode enamel. Additionally, many people have genetic issues that make their enamel relatively thin or more susceptible to erosion.

36.     Once the enamel surface of a tooth is eroded, the tooth becomes more vulnerable to tooth decay and cavities. People with thin, damaged, and eroded enamel require costly, often painful dental intervention, including fillings, crowns, and root canals.

37.     Additionally, enamel loss can cause yellowing of teeth because enamel is semi-translucent. As enamel becomes thinner, the yellow dentine tissue underneath the enamel becomes more visible.

38.     Consumers desire thicker enamel to prevent the need for costly, often painful dental procedures and to improve their overall health and wellness. Additionally, consumers seek to rebuild their enamel to make their teeth whiter.

**C. It Is Impossible to Rebuild, Restore, or Repair Enamel With Fluoride.**

39.     As shown on the Products' back label, the active ingredients in the Products are potassium nitrate and sodium fluoride:



40.     Potassium nitrate is a numbing agent for sensitivity and has no indication for improving enamel health.[5]

41.     Although sodium fluoride can help to prevent cavities and enamel loss through a process called remineralization, it cannot rebuild, repair, or restore lost enamel. Rather, enamel loss is permanent because "[u]nlike a broken bone that can be repaired by the body, once a tooth chips or breaks, the damage is done forever."[6]

42.     Numerous additional sources confirm this fact. For example, *Histology*, a well-known cellular and molecular biology atlas and textbook for medical and dental professionals, explains "[e]namel is an acellular mineralized tissue that cover the crown of the tooth. Once formed it cannot be replaced."[7]

---

[5] *See* Sunita Sharma et al.¸ *Evaluation of the clinical efficacy of potassium nitrate desensitizing mouthwash and a toothpaste in the treatment of dentinal hypersensitivity*, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3908806/ (last visited March 8, 2024).

[6] Robert Brennan, *Tooth Enamel Erosion and Restoration*, WebMD, https://www.webmd.com/oral-health/tooth-enamel-erosion-restoration (last visited March 8, 2024).

[7] M. H. Ross et al., *Histology: A text and Atlas* (6th ed. 2010).

43.     Similarly, a WebMD article titled *Can Tooth Enamel Grow Back* states that tooth enamel is "not living tissue, so it can't be naturally regenerated" and "you can't regrow it artificially either."[8]

44.     More specifically, potassium nitrate and sodium fluoride toothpastes, like the Products, are incapable of reversing enamel loss. Although there are some experimental treatments that allegedly help repair tooth enamel, a recent comparative study confirms that, even in these experimental treatments, ***"nitrate potassium/sodium fluoride . . . toothpaste did not appreciably change the enamel surface"*** of teeth (emphasis added).[9]

**D.  Haleon Concedes in Its Prior Marketing That Remineralization Does Not "Rebuild[]," "Restore[]," or "Repair" Enamel.**

45.     Enamel is a crystalline structure. It is made up of rods, which are in turn composed of thousands of microscopic hydroxylapatite crystallites.[10]

46.     Minerals, such as calcium, naturally fill the voids of the crystalline enamel structure. These minerals harden and strengthen enamel. These minerals can also be dissolved by acid, which makes the enamel structure more prone to erosion and decay.

47.     Fluoride helps naturally occurring minerals, like calcium bind to the enamel structure, which hardens existing enamel and makes it less prone to erosion. This is called remineralization.

48.     Enamel loss occurs when the crystalline structure of the tooth is permanently dissolved by acid or chipped away. No amount of remineralization can bring back enamel crystallites once they are destroyed. Thus, remineralization does not "Rebuild[]," "Restore[]" or "Repair" enamel.

---

[8] Serusha Govender, *Can Tooth Enamel Grow Back?*, WebMD, https://www.webmd.com/oral-health/features/can-tooth-enamel-grow-back (last visited March 8, 2024).

[9] Marco Lelli et al., *Remineralization and repair of enamel surface by biomimetic Zn-carbonate hydroxyaptite containing toothpaste: a comparative in vivo study*, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4155874/ (last visited March 14, 2024).

[10] National Institutes of Health, *Advanced imaging reveals structure of tooth enamel*, https://www.nih.gov/news-events/nih-research-matters/advanced-imaging-reveals-structure-of-tooth-enamel (last visited March 21, 2024).

49.     Indeed, Haleon concedes this fact. In a commercial from six years ago, Haleon advertises earlier versions of the Products that did not include the false "Rebuild[]," "Restore[]" and "Repair" claims. In this commercial, Haleon is very careful to state that the Products only protect and strengthen existing enamel. It explains that Sensodyne helps to *protect* enamel from the "***irreversible*** effects of acid erosion." and that "[u]nfortunately, once [enamel] gets damaged or wears away, it ***cannot be repaired*** or replaced."[11] It then describes the process of fluoride remineralization. In other words, Haleon's prior marketing expressly concedes that remineralization is not the same as a repair because enamel cannot be repaired.

50.     Further, reasonable consumers do not know and are not expected to know what remineralization is because it is a highly technical process. Therefore, they cannot understand Haleon's claims to mean that the Products remineralize teeth. Rather, reasonable consumers understand Haleon's "Rebuid[]" and "Restore[]" that the Products restore and rebuild the lost enamel.

51.     Although Haleon references on the side-panel of the Intensive Enamel Repair Product version of the Product that it "is proven to drive mineral deep into the enamel surface to help actively repair acid-weakened areas of the enamel" and that it "locks in minerals" this side-panel disclosure is purposefully vague and confusing. This reference to "minerals" does not educate consumers regarding the concept of remineralization. Indeed, it assumes that they are already aware of this concept and will understand that the product does not actually repair teeth but only re-mineralizes them to prevent further enamel loss. The panel also conflates the issues of thinning enamel and remineralization. The panel explains that "[a]cids in modern diets can weaken your enamel surface" and "[o]ver time . . . can lead to your enamel thinning." Above that, the same panel shows that the process of "Lock[ing] in Minerals" with a picture of a health tooth afterward. This causes reasonable consumers to understand that the Product can repair the condition of thinning enamel. Even if this disclosure were somehow helpful, it only appears on the Intensive Enamel Repair version of the Products. It does not appear on any other version of the Products.

---

[11] Pronamel US, *How Does Pronamel® Toothpaste Strengthen Enamel* (Sept. 11, 2017), Youtube, https://www.youtube.com/watch?v=AmzI0ktgwVE&t=3s

**E.  Federal and State Regulations Governing Labeling of Fluoride Toothpaste.**

52.     The requirements of the federal Food, Drug & Cosmetic Act ("FDCA"), and its labeling regulations were adopted by the California legislature in the Sherman Food Drug & Cosmetic Law (the "Sherman Law").  Cal. Health & Safety Code § 111330 ("Any drug or device is misbranded if its labeling is false or misleading in particular"); 21 U.S.C. § 352 ("A drug or device shall be deemed to be misbranded . . . [i]f its labeling is false or misleading in any particular.").

53.     Additionally, the U.S. Food and Drug Administration ("FDA") has issued a monograph, which is codified as federal regulation, and is incorporated into California law, detailing the ways in which OTC dental products containing fluoride can be labeled.

54.     The monograph states, in pertinent part, that an OTC drug containing fluoride or its derivatives, can include the indication that it "[a]ids in the ***prevention*** of dental . . . 'cavities' [or] 'decay' . . . [or] '[o]ther truthful and nonmisleading statements . . . ***describing only the indication for use*** that has been established and listed in this [paragraph]," i.e., that the product aids in the prevention of cavities or dental decay. Anticaries Drug Products for Over-the-Counter Human Use, Final Monograph, 60 FR 52474-01, Subpart C - Labeling(c) (emphasis added). The monograph emphasizes that fluoride's indications are preventative only, not restorative.

55.     Haleon's "Rebuild[]," "Restore[]," and "Repair" claims are unfair, unlawful, and deceptive because they falsely, untruthfully and illegally claim and suggest that the Products can restore, repair or rebuild—i.e., bring back or return—lost enamel, not simply *preventing* further dental decay.

56.     Plaintiff's state law causes of actions, described herein, are consistent with and do not seek to impose any obligations that are additional to or contradictory to federal law. Thus, they are not preempted.

**F.  Haleon's Marketing and Labeling of the Products is False, Deceptive, and Misleading.**

57.     Haleon's representations of "Restore[]" and "Rebuild[]" on the packaging of the Products lead reasonable consumers to understand that the Products can "bring back" or return lost enamel. This is entirely reasonable given that the very definition of "restore" is "to put or

bring back [something] into existence or use."[12] Similarly, reasonable consumers understand the "Rebuild[]" representation to mean that the Products can restore, return or put back an individual's enamel to its original state.[13] Finally, "Repair," in ordinary usage means to restore something that is damaged or broken. However, as Haleon is aware, once enamel is lost, it is gone for good and cannot be restored, rebuilt, or repaired.[14] At best, the fluoride in the Products revent further tooth decay, but it does nothing to reverse or return the enamel to (or even closer to) its original state. This functionality is no different than any other ordinary anticavity toothpaste with sodium fluoride.

58.     Nothing on the Products cure Haelon's illegal, false and deceptive claims. Indeed, Haleon's explanations of enamel erosion and pictures illustrating how the Products work discussed *supra* compound their misrepresentations.

**G.  Haleon Misleadingly Markets the Products as Capable of Rebuilding, Restoring, and Repairing Lost Enamel To Increase Profits and Gain a Competitive Edge.**

59.     The advertising, marketing and sale of the Products as capable of bringing back lost enamel is of material concern to consumers because consumers desire to increase overall oral health, undo enamel damage, reverse small cavities that have begun to form in their teeth, and prevent the need for costly, often painful dental work.

60.     Haleon knew and intended that consumers would purchase, and pay a premium for Products labeled and marketed as capable of "Rebuild[ing]," "Restor[ing]" and/or "Repair[ing]" enamel. Specifically, many consumers struggle with lost or thinning enamel despite the use of an ordinary anticavity toothpaste with sodium fluoride. Haleon's marketing and advertising is designed to convince consumers that the Products are specifically for consumers that have thinning or lost enamel and that the Products contain ingredients that are superior to other fluoride anticavity toothpastes. They are not.

---

[12] *Restore*, MERRIAM-WEBSTER.COM DICTIONARY, https://www.merriam-webster.com/dictionary/restore.

[13] *Rebuild*, MERRIAM-WEBSTER.COM DICTIONARY, https://www.merriam-webster.com/dictionary/rebuild.

[14] https://www.pronamel.us/tooth-enamel/what-is-tooth-enamel/

61.     Indeed, the whole Pronamel line of Products is a clever marketing ruse, specifically designed to take advantage of a lack of consumer knowledge and understanding of complicated dental matter. The only ingredient that distinguishes the Pronamel line of Products from ordinary Sensodyne toothpaste (which has a numbing agent), is sodium fluoride. *See* ¶ 40. This is the same ingredient contained in all other anticavity toothpastes that are comparatively much less expensive and have been available for more than 40 years:





62.     Crest uses a Sodium fluoride 0.243% (0.15% w/v fluoride ion) which is nearly identical to the concentration of 0.25% Sodium fluoride (0.15% w/v fluoride ion) used in the Products. *See id.* However, contrary to the Products, Crest complies with the FDA Anticaries Monograph, which allows it to make only truthful, non-misleading claims that the products *prevent* cavities and tooth decay such as "HELPS STOP CAVITIES BEFORE THEY START" and "CAVITY PROTECTION."

63.     To falsely, deceptively, unfairly and unlawfully distinguish itself from other anticavity toothpastes, and permit Haleon to extract a premium price from unsuspecting consumers, Haleon represents that "Pronamel has a proven specialist technology that he been developed to maximize the effect of fluoride on enamel"—i.e, to "Rebuild[]," "Restore[]," and/or "Repair" enamel. In other words, Haleon's advertising and marketing campaign is specifically designed to convince unknowledgeable consumers that its Products are somehow different than

any other fluoride toothpaste, and that as opposed to other toothpastes that can just prevent tooth decay and cavities, the Products have a special and unique technology to restore, repair and rebuild lost enamel. However, this is false.

64.     Haleon engaged in the practices complained of herein to further its private interests of: (i) increasing sales of the Products while decreasing the sales of Products that do not claim to be able to "Rebuild[]," "Restore[]," and/or "Repair" enamel,  (ii) commanding a higher price for its Products because consumers will pay more for toothpaste that can "Rebuild[]" or "Restore[]" or "Repair []" lost or weakened enamel.

65.     It has been highly lucrative for Haleon to make false, misleading, unfair, and unlawful claims regarding the ability of the Products to bring back, repair, restore or rebuild lost enamel. While other brands are stagnating, Haleon's Pronamel sales have substantially increased as a percentage of market share. Haleon has an incentive to continue to make such false representations on the Products to gain an unfair advantage over its competitors.

**H.  Plaintiffs' Experiences.**

66.     On or around May 2023, Plaintiff Jones purchased Sensodyne Pronamel toothpaste from a CVS Pharmacy near her home in San Diego, CA. Plaintiff Jones made the purchase after reading and relying on the truthfulness of the Product's label that represented that it would "Rebuild[]" and "Restore[]" enamel. Plaintiff Jones reasonably understood that the Products would rebuild and restore her thinning and lost enamel. She later learned that this was untrue. As a result of Haleon's misrepresentations and omissions, Plaintiff Jones paid a premium for the Product. Had Haleon not misrepresented (by omission and commission) the ability of the Product to "Rebuild[]" and "Restore[]" enamel, Plaintiff Jones would not have purchased it or, at a very minimum, she would have paid less for it.

67.     Multiple times over the past four years, Plaintiff Silva purchased Sensodyne Pronamel Intensive Enamel Repair toothpaste from a CVS Pharmacy near his home in San Francisco, CA. Plaintiff Silva made the purchase after reading and relying on the truthfulness of the Product's label that represented that it "Repairs" enamel. Plaintiff Silva reasonably understood that the Products would repair his thinning and lost enamel. He later learned that this

was untrue. As a result of Haleon's misrepresentations and omissions, Plaintiff Silva paid a premium for the Product. Had Haleon not misrepresented (by omission and commission) the ability of the Product to "Repair[]" enamel, Plaintiff Silva would not have purchased it or, at a very minimum, he would have paid less for it.

68.     Plaintiffs have been economically damaged by their purchase of the Products because the advertising for the Products was and is untrue and/or misleading under California law; therefore, the Products are worth less than what Plaintiffs paid for them and/or Plaintiffs did not receive what they reasonably intended to receive.

69.     Plaintiffs continue to desire to purchase toothpaste that can rebuild, restore, and repair thinning enamel, including those marketed and sold by Haleon because thicker enamel would improve their oral health, make them less likely to get cavities, and whiten their teeth. If the Products were reformulated to actually rebuild lost enamel, Plaintiffs would purchase them again in the future. Plaintiffs regularly visit stores where Haleon's products and other oral healthcare products are sold. Plaintiffs understand that the formula of the Products may change over time. But as long as Haleon may use the phrase "Repair[]," "Restore[]," and "Rebuild[]" enamel on Products that cannot actually bring back lost enamel, Plaintiffs will be unable to rely on Haleon's representations regarding the benefits and protection offered by its Products. Thus, Plaintiffs are likely to be repeatedly presented with false or misleading information when shopping and they will be unable to make informed decisions about whether to purchase Haleon's Products and will be unable to evaluate the different prices between Haleon's Products and competitors' products. Plaintiffs are further likely to be repeatedly misled by Haleon's conduct, unless and until Haleon is compelled to ensure that its representations are accurate.

## **CLASS ALLEGATIONS**

70.     In addition to their individual claims, Plaintiffs bring this class action lawsuit on behalf of themselves and a proposed class and subclass of similarly situated persons, pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, defined as follows:

**Class**

All persons who, between June 28, 2020 and the present, purchased the Products in the United States (the "Class").

Excluded from this Class is Haleon, its parents, subsidiaries, affiliates, officers and directors, and those who purchased the Products for the purpose of resale.

**California Subclass**

All Class Members who purchased the Products in California (the "Subclass").

71.      This action has been brought and may properly be maintained as a class action against Haleon because there is a well-defined community of interest in the litigation and the proposed Class and Subclass are easily ascertainable.

72.      Numerosity:  Plaintiffs do not know the exact size of the Class, but they estimate it is composed of more than 5,000 persons. The persons in the Class are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

73.      Common Questions Predominate:  This action involves common questions of law and fact to the proposed Class because each class member's claim derives from the same deceptive, unlawful and/or unfair statements and omissions. The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Class to recover.  The questions of law and fact common to the Class include, but are not limited to, the following:

   a.  whether the Products "Rebuild[]," "Restore[]," and/or "Repair[]" enamel;

   b.  whether Haleon unfairly, unlawfully, and/or deceptively misrepresented that the Products ""Rebuild[]," "Restore[]," and/or "Repair[]" enamel;

   c.  whether Haleon's actions violate federal and California laws invoked herein;

   d.  whether labeling the Products with the representations "Rebuilds," "Restores," and/or "Repairs" enamel causes the Products to command a price premium in the market as compared with similar products that do not make such claims;

   e.  whether Haleon's advertising and marketing of the Products with the claims "Rebuilds," "Restores," and/or "Repairs" enamel deceives reasonable consumers and/or was unfair;

   f.  whether the claims "Rebuilds," "Restores," and/or "Repairs" enamel on product packaging and advertising is material to reasonable consumers;

g.   whether Haleon engaged in the alleged conduct knowingly, recklessly, or

negligently;

h.   the amount of profits and revenues earned by Haleon as a result of the conduct;

i.   whether class members are entitled to restitution, injunctive and other equitable

relief and, if so, what is the nature (and amount) of such relief; and

j.   whether class members are entitled to payment of actual, incidental, consequential,

exemplary and/or statutory damages plus interest thereon, and if so, what is the

nature of such relief.

74.     Typicality:  Plaintiffs' claims are typical of the claims of other members of the

Class because, among other things, all such claims arise out of the same wrongful course of

conduct in which Haleon engaged in violation of law as described herein. Plaintiffs and class

members purchased one or more tubes of the Products. In addition, Haleon's conduct that gave

rise to the claims of Plaintiffs and class members (i.e., marketing, sales and advertising of the

Products as "Rebuild[ing]," "Restor[ing]," and/or "Repair[ing]" enamel) is the same for Plaintiffs

and all members of the Class. Plaintiffs' claims, like the claims of the class members, arise out of

the same common course of conduct by Haleon and are based on the same legal and remedial

theories.

75.     Adequacy of Representation:  Plaintiffs will fairly and adequately protect the

interests of all class members because it is in their best interests to prosecute the claims alleged

herein to obtain full compensation due to them for the unfair and illegal conduct of which they

complain.  Plaintiffs also have no interests that are in conflict with, or antagonistic to, the interests

of class members.  Plaintiffs have retained highly competent and experienced class action

attorneys to represent their interests and that of the Class. By prevailing on their own claims,

Plaintiffs will establish Haleon's liability to all class members. Plaintiffs and their counsel have

the necessary financial resources to adequately and vigorously litigate this class action, and

Plaintiffs and counsel are aware of their fiduciary responsibilities to the class members and are

determined to diligently discharge those duties by vigorously seeking the maximum possible

recovery for class members.

76.     Superiority:  There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the proposed Class will tend to establish inconsistent standards of conduct for Haleon and result in the impairment of class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual member of the class may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action.

77.     Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### PLAINTIFFS' FIRST CAUSE OF ACTION
**(Violation of the Consumers Legal Remedies Act, California Civil Code §§ 1750, *et seq.*)**
**On Behalf of Themselves and the Subclass**

78.     Plaintiffs reallege and incorporate the previous paragraphs of this Class Action Complaint as if set forth herein.

79.     Haleon's actions, representations and conduct have violated, and continue to violate the CLRA, because they extend to transactions that are intended to result, or which have resulted, in the sale or lease of goods or services to consumers.

80.     Plaintiffs and other subclass members are "consumers" as that term is defined by the CLRA in California Civil Code § 1761(d).

81.     The Product that Plaintiffs (and other similarly situated subclass members) purchased from Haleon were "goods" within the meaning of California Civil Code § 1761(a).

82.     Haleon's acts, practices, and omissions set forth in this Class Action Complaint led reasonable consumers to falsely believe that the Products can rebuild lost enamel. By engaging in the actions, representations and conduct set forth in this Class Action Complaint, Haleon has

violated, and continues to violate, § 1770(a)(2), § 1770(a)(5), § 1770(a)(7), § 1770(a)(8), and § 1770(a)(9) of the CLRA. In violation of California Civil Code §1770(a)(2), Haleon's acts and practices constitute improper representations regarding the source, sponsorship, approval, or certification of the goods they sold. In violation of California Civil Code §1770(a)(5), Haleon's acts and practices constitute improper representations that the goods they sell have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities, which they do not have. In violation of California Civil Code §1770(a)(7), Haleon's acts and practices constitute improper representations that the goods it sells are of a particular standard, quality, or grade, when they are of another. In violation of California Civil Code §1770(a)(8), Haleon has disparaged the goods, services, or business of another by false or misleading representation of fact. In violation of California Civil Code §1770(a)(9), Haleon has advertised goods or services with intent not to sell them as advertised.

83. Plaintiffs request that this Court enjoin Haleon from continuing to employ the unlawful methods, acts and practices alleged herein pursuant to California Civil Code § 1780(a)(2). If Haleon is not restrained from engaging in these types of practices in the future, Plaintiffs and the other members of the Subclass will continue to suffer harm.

84. CLRA § 1782 NOTICE. Plaintiffs provided Haleon with notice and demand that Haleon correct, repair, replace or otherwise rectify the unlawful, unfair, false and/or deceptive practices complained of herein. Despite receiving the aforementioned notice and demand, Haleon failed to do so. Among other things, Haleon failed to identify similarly situated customers, notify them of their right to correction, repair, replacement or other remedy, and/or to provide that remedy. Accordingly, Plaintiffs seek, pursuant to California Civil Code § 1780(a)(3), on behalf of themselves and those similarly situated, compensatory damages, punitive damages and restitution of any ill-gotten gains due to Haleon's acts and practices.

85. Plaintiffs also requests that this Court award their costs and reasonable attorneys' fees pursuant to California Civil Code § 1780(d).

**PLAINTIFFS' SECOND CAUSE OF ACTION**
**(False Advertising, Business and Professions Code §§ 17500, *et seq.* ("FAL"))**
**On Behalf of Themselves and the Subclass**

86.     Plaintiffs reallege and incorporate by reference the previous paragraphs of this Class Action Complaint as if set forth herein.

87.     Beginning at an exact date unknown to Plaintiffs, but within three (3) years preceding the filing of the Class Action Complaint, Haleon made untrue, false, deceptive and/or misleading statements in connection with the advertising and marketing of the Product.

88.     Haleon made representations and statements (by omission and commission) regarding the Products' ability to "Rebuild[]," "Restore[]," and/or "Repair[]" enamel that led reasonable customers to believe that the Product would, in fact, bring back or return lost enamel. Haleon omitted the material fact that once enamel loss occurs, it is permanent and that the Products cannot rebuild, restore, and/or repair lost enamel.

89.     Plaintiffs and those similarly situated relied to their detriment on Haleon's false, misleading and deceptive advertising and marketing practices, including each of the misrepresentations and omissions set forth above. Had Plaintiffs and those similarly situated been adequately informed and not intentionally deceived by Haleon, they would have acted differently by, without limitation, refraining from purchasing the Products or paying less for them.

90.     Haleon's acts and omissions are likely to deceive the general public.

91.     Haleon engaged in these false, misleading and deceptive advertising and marketing practices to increase its profits.  Accordingly, Haleon has engaged in false advertising, as defined and prohibited by section 17500, *et seq.* of the California Business and Professions Code.

92.     The aforementioned practices, which Haleon used, and continues to use, to its significant financial gain, also constitutes unlawful competition and provides an unlawful advantage over Haleon's competitors as well as injury to the general public.

93.     As a direct and proximate result of such actions, Plaintiffs and the other subclass members have suffered, and continue to suffer, injury in fact and have lost money and/or property as a result of such false, deceptive and misleading advertising in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court. In particular, Plaintiffs, and those similarly situated, paid a price premium for the Products, i.e., the difference between the price consumers paid for the Products and the price that they would have paid but for

Haleon's misrepresentation. This premium can be determined by using econometric or statistical techniques such as hedonic regression or conjoint analysis. Alternatively, Plaintiffs and those similarly situated will seek a full refund of the price paid upon proof that the sale of the Products was unlawful.

94.     Plaintiffs seek equitable relief, including restitution, with respect to their FAL claims. Pursuant to Federal Rule of Civil Procedure 8(e)(2), Plaintiffs make the following allegations in this paragraph only hypothetically and as an alternative to any contrary allegations in their causes of action 1 and 3, in the event that such causes of action will not succeed. Plaintiffs and the Subclass may be unable to obtain monetary, declaratory and/or injunctive relief directly under causes of action 1 and 3 and will lack an adequate remedy at law, if the Court requires them to show classwide reliance and materiality beyond the objective reasonable consumer standard applied under the FAL, because Plaintiffs may not be able to establish each class member's individualized understanding of Haleon's misleading representations, but the FAL does not require individualize proof of deception or injury by absent class members. *See, e.g., Ries v. Ariz. Bevs. USA LLC,* 287 F.R.D. 523, 537 (N.D. Cal. 2012) ("restitutionary relief under the UCL and FAL 'is available without individualized proof of deception, reliance, and injury.'").  In addition, Plaintiffs and the Subclass may be unable to obtain such relief under cause of action 3 and will lack an adequate remedy at law, if Plaintiffs are unable to demonstrate the requisite *mens rea* (intent, reckless, and/or negligence), because the FAL imposes no such *mens rea* requirement and liability exists even if Haleon acted in good faith.

95.     Plaintiffs seek, on behalf of themselves and those similarly situated, a declaration that the above-described practices constitute false, misleading and deceptive advertising.

96.     Plaintiffs seek, on behalf of themselves and those similarly situated, an injunction to prohibit Haleon from continuing to engage in the false, misleading and deceptive advertising and marketing practices complained of herein. Such misconduct by Haleon, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that Haleon will continue to violate the laws of California, unless specifically ordered to comply with the same. This expectation of future

1   violations will require current and future consumers to repeatedly and continuously seek legal

2   redress in order to recover monies paid to Haleon to which it is not entitled.  Plaintiffs and those

3   similarly situated have no other adequate remedy at law to ensure future compliance with the

4   California Business and Professions Code alleged to have been violated herein.

5                      **PLAINTIFFS' THIRD CAUSE OF ACTION**
                        **(Fraud, Deceit and/or Misrepresentation)**
6                      **On Behalf of Themselves and the Class**

7        97.    Plaintiffs reallege and incorporate by reference the previous paragraphs of this

8   Class Action Complaint as if set forth herein.

9        98.    Haleon has fraudulently and deceptively led reasonable consumers to believe that

10  the Products "Rebuild[]," "Restore[]," and/or "Repair[]" lost enamel. Haleon omitted the material

11  fact that enamel loss is permanent and that the Products cannot rebuild, restore, and/or repair lost

12  enamel.

13       99.    These misrepresentations and omissions were known exclusively to, and actively

14  concealed by, Haleon, not reasonably known to Plaintiffs, and material at the time they were

15  made. Haleon knew that enamel cannot be rebuilt, restored, or repaired once lost. Haleon's

16  misrepresentations and omissions concerned material facts that were essential to the analysis

17  undertaken by Plaintiffs as to whether to purchase Haleon's Products. In misleading Plaintiffs and

18  not so informing Plaintiffs, Haleon breached its duty to them. Haleon also gained financially

19  from, and as a result of, its breach.

20       100.   Plaintiffs and those similarly situated relied to their detriment on Haleon's

21  misrepresentations and fraudulent omissions. Had Plaintiffs and those similarly situated been

22  adequately informed and not intentionally deceived by Haleon, they would have acted differently

23  by, without limitation: (i) declining to purchase the Product, (ii) purchasing less of it, or (iii)

24  paying less for the Product.

25       101.   By and through such fraud, deceit, misrepresentations and/or omissions, Haleon

26  intended to induce Plaintiffs and those similarly situated to alter their position to their detriment.

27  Specifically, Haleon fraudulently and deceptively induced Plaintiffs and those similarly situated

28  to, without limitation, purchase the Product.

102.     Plaintiffs and those similarly situated justifiably and reasonably relied on Haleon's misrepresentations and omissions, and, accordingly, were damaged by Haleon.

103.     As a direct and proximate result of Haleon's misrepresentations and/or omissions, Plaintiffs and those similarly situated have suffered damages, including, without limitation, the amount they paid for the Products.

104.     Haleon's conduct as described herein was wilful and malicious and was designed to maximize Haleon's profits even though Haleon knew that it would cause loss and harm to Plaintiffs and those similarly situated.

### PLAINTIFFS' FOURTH CAUSE OF ACTION
**(Unlawful, unfair, and fraudulent trade practices violation of Business and Professions Code § 17200, *et seq.*)**
**On Behalf of Themselves and the Subclass**

105.     Plaintiffs reallege and incorporate by reference the previous paragraphs of this Class Action Complaint as if set forth herein.

106.     Within four (4) years preceding the filing of this lawsuit, and at all times mentioned herein, Haleon has engaged, and continues to engage, in unlawful, unfair, and fraudulent trade practices in California by engaging in the unlawful, unfair, and fraudulent business practices outlined in this complaint.

107.     In particular, Haleon has engaged, and continues to engage, in unlawful practices by, without limitation, violating the following state and federal laws: (i) the CLRA as described herein; (ii) the FAL as described herein; (iii) the advertising provisions of the Sherman Law (Article 3), including without limitation, California Health & Safety Code §§ 110390, 110395, 110398 and 110400; (iv) the misbranded drug provisions of the Sherman Law (Article 3), including without limitation, California Health & Safety Code §§ 111330, 111440, 111445, 111450; (v) and federal laws regulating the advertising and branding of drugs in 21 U.S.C. § 352(a), *et seq.* and FDA regulations, which are incorporated into the Sherman Law (California Health & Safety Code §§ 110111, 110380); and (vi) the Federal Regulations for Labeling of Anticaries Drug Products for Over-the-Counter Human Use; 21 CFR § 355.50, *et seq*.

108.     In particular, Haleon has engaged, and continues to engage, in unfair and

fraudulent practices by, without limitation, making fraudulent and deceptive representations regarding its Products' ability to "Rebuild[]," "Restore[]," and/or "Repair[]" enamel that led reasonable customers to believe that the Product would bring back lost enamel. Haleon omitted the material fact that enamel loss is permanent and that the Products cannot rebuild, restore, and/or repair lost enamel.

109.    Plaintiffs and those similarly situated relied to their detriment on Haleon's unlawful, unfair, and fraudulent business practices. Had Plaintiffs and those similarly situated been adequately informed and not deceived by Haleon, they would have acted differently by, without limitation: (i) declining to purchase the Product, (ii) purchasing less of the Product, or (iii) paying less for the Product.

110.    Haleon's acts and omissions are likely to deceive the general public.

111.    Haleon engaged in these deceptive and unlawful practices to increase its profits. Accordingly, Haleon has engaged in unlawful trade practices, as defined and prohibited by section 17200, *et seq.* of the California Business and Professions Code.

112.    The aforementioned practices, which Haleon has used to its significant financial gain, also constitute unlawful competition and provide an unlawful advantage over Haleon's competitors as well as injury to the general public.

113.    As a direct and proximate result of such actions, Plaintiffs and the other subclass members, have suffered and continue to suffer injury in fact and have lost money and/or property as a result of such deceptive and/or unlawful trade practices and unfair competition in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court. Among other things, Plaintiffs and the subclass members lost the amount they paid for the Product.

114.    As a direct and proximate result of such actions, Plaintiffs and the other members of the Subclass have suffered and continue to suffer injury in fact and have lost money and/or property as a result of such deceptive and/or unlawful trade practices and unfair competition in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court. In particular, Plaintiffs and those similarly situated paid a price premium for the Products,

i.e., the difference between the price consumers paid for the Products and the price that they would have paid but for Haleon's misrepresentation. This premium can be determined by using econometric or statistical techniques such as hedonic regression or conjoint analysis. Alternatively, Plaintiffs and those similarly situated will seek a full refund of the price paid upon proof that the sale of the Products was unlawful.

115.    Plaintiffs seek, on behalf of themselves and those similarly situated, equitable relief, including restitution for the premium and/or the full price that they and others paid to Haleon as result of Haleon's conduct. Plaintiffs and the Subclass lack an adequate remedy at law to obtain such relief with respect to their "unfairness" claims under the UCL, because there is no cause of action at law for "unfair" conduct.  Plaintiffs and the Subclass similarly lack an adequate remedy at law to obtain such relief with respect to their "unlawfulness" under the UCL cause of action because the FTC Green Guides and Environmental Claims Marketing Act do not provide a direct cause of action, so Plaintiffs and the Subclass must allege those violations as predicate acts under the UCL to obtain relief.

116.    Plaintiffs also seek equitable relief, including restitution, with respect to their UCL unlawfulness claims for violations of the CLRA, FAL and their UCL deceptiveness claims. Pursuant to Federal Rule of Civil Procedure 8(e)(2), Plaintiffs make the following allegations in this paragraph only hypothetically and as an alternative to any contrary allegations in their causes of action 1 and 3, in the event that such causes of action will not succeed. Plaintiffs and the Subclass may be unable to obtain monetary, declaratory and/or injunctive relief directly under causes of action 1 and 3, and will lack an adequate remedy of law, if the Court requires them to show class-wide reliance and materiality beyond the objective reasonable consumer standard applied under the UCL, because Plaintiffs may not be able to establish each class member's individualized understanding of Haleon's misleading representations, but the UCL does not require individualized proof of deception or injury by absent class members. *See, e.g., Stearns v Ticketmaster,* 655 F.3d 1013, 1020, 1023–25 (9th Cir. 2011) (distinguishing, for purposes of CLRA claim, among class members for whom website representations may have been materially deficient, but requiring certification of UCL claim for entire class). In addition, Plaintiffs and the Subclass may be unable to

obtain such relief under cause of action 3 and will lack an adequate remedy at law, if Plaintiffs are unable to demonstrate the requisite *mens rea* (intent, reckless, and/or negligence), because the UCL imposes no such *mens rea* requirement and liability exists even if Haleon acted in good faith.

117.   Plaintiffs seek, on behalf of those similarly situated, a declaration that the above-described trade practices are fraudulent, unfair, and/or unlawful.

118.   Plaintiffs seek, on behalf of those similarly situated, an injunction to prohibit Haleon from continuing to engage in the deceptive and/or unlawful trade practices complained of herein.  Such misconduct by Haleon, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that Haleon will continue to violate the laws of California, unless specifically ordered to comply with the same.  This expectation of future violations will require current and future consumers to repeatedly and continuously seek legal redress in order to recover monies paid to Haleon to which they were not entitled.  Plaintiffs and those similarly situated have no other adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been violated herein.

**PLAINTIFFS' FIFTH CAUSE OF ACTION**
**(Unjust Enrichment)**
**On Behalf of Themselves and the Class**

119.   Plaintiffs reallege and incorporate by reference the previous paragraphs of this Class Action Complaint as if set forth herein.

120.   Plaintiffs and those similarly situated conferred benefits on Haleon by paying for the Products, including a price premium, i.e., the difference between the price consumers paid for the Products and the price that they would have paid but for Haleon's inequitable conduct alleged herein, which misled Plaintiffs and those similarly situated regarding the Products' ability to "Rebuild[]", "Restore[]", and "Repair[]" lost enamel.

121.   It would be unjust and inequitable for Haleon to retain the benefits of its misconduct as alleged herein, because, among other things, Haleon misled Plaintiffs and those similarly situated regarding the Products, Haleon knew or should have known that they misled

their customers, and Haleon knowingly or negligently accepted the price premiums paid by Plaintiffs and those similarly situated.

122.    Haleon engaged in these unjust practices to increase their profits to the detriment of Plaintiffs and those similarly situated.

123.    Because Haleon's retention of the non-gratuitous benefit conferred on it by Plaintiffs and Class members is unjust and inequitable, Haleon must pay restitution to Plaintiffs and the Class members for its unjust enrichment, as ordered by the Court.

124.    Plaintiffs, therefore, seeks an order requiring Haleon to make restitution to them and other members of the Class.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and those similarly situated, respectfully request that the Court enter judgment against Haleon as follows:

A.  Certification of the proposed Class, including appointment of Plaintiffs' counsel as Class counsel;

B.  An order temporarily and permanently enjoining Haleon from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C.  An award of compensatory damages in an amount to be determined at trial, except as to those causes of action where compensatory damages are not available by law;

D.  An award of statutory damages in an amount to be determined at trial, except as to those causes of action where compensatory damages are not available by law;

E.  An award of punitive damages in an amount to be determined at trial, except as to those causes of action where punitive damages are not available by law;

F.  An award of treble damages, except as to those causes of action where treble damages are not available by law;

G.  An award of restitution in an amount to be determined at trial;

H.  An order requiring Haleon to pay both pre- and post-judgment interest on any amounts awarded;

I.   For reasonable attorney's fees and the costs of suit incurred; and

J.   For such further relief as this Court may deem just and proper;

## **JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

Dated: July 3, 2024                              **GUTRIDE SAFIER LLP**


                                                 */s/Seth A. Safier/*
                                                 Seth A. Safier, Esq.
                                                 Marie McCrary, Esq.
                                                 Rajiv V. Thairani, Esq.
                                                 100 Pine Street, Suite 1250
                                                 San Francisco, CA 94111

# EXHIBIT A

I, Anderson Silva, declare:

1.      I am a Plaintiff in this action. If called upon to testify, I could and would competently testify to the matters contained herein based upon my personal knowledge.

2.      I submit this Declaration pursuant to California Code of Civil Procedure section 2215.5 and California Civil Code section 1780(d).

3.      As set forth in my complaint, I purchased multiple times within the past four years Sensodyne Pronamel Repair toothpaste from CVS while in San Francisco County, California.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct.

Executed this 31st day of January 2024, in San Francisco, California.

DocuSigned by:

B35F522122B6422...

_____
Anderson Silva

DECLARATION RE CAL. CIV. CODE SECTION 1780(D) JURISDICTION

# EXHIBIT B





